CHURCH OF CHRIST AT INDEPENDENCE, MO., et al. v. REORGANIZED CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS.[1]

(Circuit Court of Appeals, Eighth Circuit. September 30, 1895.)

No. 516.

**1. EQUITY—ASSERTING TITLE TO LAND.**

A complainant who has only an equitable title to land cannot maintain a suit in chancery to recover possession of the land from an adverse occupant, unless such occupant holds the legal title and the complainant seeks to obtain it, or unless the adverse occupant acquired possession of the land under the alleged equitable title, or is so connected therewith that it may be asserted against him. Accordingly, *held*, that a complainant asserting an equitable title to land could not maintain a suit in chancery to enforce it and to recover possession from occupants who were alleged in the bill to be without any title, legal or equitable, to the land, and therefore occupied the position of mere trespassers.

**2. SAME—LACHES.**

The R. Church of Latter-Day Saints brought suit, in 1891, against one H., trustee, and others, to assert an alleged equitable title to land occupied by the defendants, and held by them for another church. It was alleged in the bill that the person from whom both parties deduced title had, in 1839, conveyed the property in question, with other lands, in trust for a church of which the complainant was successor. It appeared that this trust deed was not recorded until 1870, and its existence was unknown until then. It was then recorded, and its existence thenceforth well known to the complainant and its predecessors, but no claim to the property was asserted until 1887, when a demand was served on the defendants by the complainant's predecessor. No suit, however, was commenced until 1891. In the meantime the widow and heirs of the original holder of the title had conveyed all the land alleged to be granted by the deed of 1839 by a deed executed and duly recorded in 1848, under which titles had been made to numerous persons who had built upon and improved the property, down to the bringing of the suit in 1891, and parts of the land had been laid out and plotted as additions to a city, and maps thereof filed. The defendants and their predecessors had paid all the taxes upon the land in controversy from the year 1867, and

[1] Rehearing denied December 9, 1895.

had built a church thereon and occupied it since the year 1852. It also appeared that, some years before the commencement of the suit, the R. church had erected a building for church purposes near, but outside of, the land in controversy, which was at the time occupied and used by the church for which the defendants held it. *Held*, that the complainant and those whom it represented had been guilty of such laches as should bar them from relief in equity, even though it were established that the original grantor had held the land charged with a trust for complainant or those whom it represented.

Appeal from the Circuit Court of the United States for the Western District of Missouri.

This was a suit in equity which was brought by the Reorganized Church of Jesus Christ of Latter-Day Saints, the appellee, to obtain control and possession of lots 15, 16, 17, 18, 19, 20, 21, and 22 in Woodson & Maxwell's addition to the city of Independence, Mo. The suit was brought against the Church of Christ at Independence, Mo., Richard Hill, trustee, Richard Hill, Mrs. E. Hill, George Frisbie, Mrs. E. Frisbie, Nannie Frisbie, Daniel Bauder, and G. D. Cole, the appellants, who were at the time in possession of the lots in question, and were using a small church edifice erected thereon as a house of worship. The complainant, the Reorganized Church of Jesus Christ of Latter-Day Saints, is a corporation of the state of Iowa, having its principal place of business at Lamoni in that state. It alleged that it was the equitable owner of the several lots in controversy, and deraigned its title thereto in the following manner, that is to say: It averred that the lots were conveyed to one Edward Partridge on December 19, 1832, by a deed which in form conveyed an estate in fee simple, but that in point of fact said Edward Partridge purchased the property with money furnished for that purpose by the Church of Jesus Christ of Latter-Day Saints formerly of Kirtland, Ohio, and that from and after the purchase of the same he held the title thereto in trust for the use and benefit of said church; that on March 28, 1839, said Partridge conveyed said property to Jane Cowdery, Joseph Smith Cowdery, and John Cowdery, in trust for the use of the Church of Jesus Christ of Latter-Day Saints, formerly of Kirtland, Ohio, and in and by said deed recited that he had theretofore acquired the property with money furnished by said church, and that he had theretofore held the title thereto in trust for its use and benefit; that on March 28, 1839, said Jane Cowdery, Joseph Smith Cowdery, and John Cowdery, the grantees named in said trust deed, were minor children of Oliver Cowdery; that said minor children died intestate before attaining their majority, leaving as their heirs their mother, Elizabeth Ann Cowdery, widow of Oliver Cowdery, and a married sister, Marie Louise Johnson; that Elizabeth A. Cowdery, the mother of said minors, subsequently conveyed all her interest in the property in controversy to her said daughter, Marie Louise Johnson, and that on June 9, 1887, said Marie Louise Johnson and her husband conveyed said property to George A. Blakeslee, bishop of the Reorganized Church of Jesus Christ of Latter-Day Saints, in trust for the use and benefit of said church; that said George A. Blakeslee died in the year 1890; and that one E. L. Kelley was thereupon appointed bishop of said Reorganized Church of Jesus Christ of Latter-Day Saints.

The bill of complaint further averred that after the death of said Edward Partridge, to wit, on May 5, 1848, his widow, Lydia Partridge, and three of his children, conveyed the lots in controversy to James Pool, notwithstanding the fact that they had no title thereto by reason of the previous conveyance of the same on March 28, 1839, to the minor children of Oliver Cowdery; that said James Pool, shortly thereafter, conveyed said property to John Maxwell; and that, by virtue of several other purchases and mesne conveyances, the Pool title to the premises in controversy became vested in one Granville Hedrick in trust for the Church of Jesus Christ of Latter-Day Saints, which said last-named church the bill averred to be the same church, under a different name, as the Reorganized Church of Jesus Christ of Latter-Day Saints. The bill further averred that Granville Hedrick subse-

quently died, and that in an ex parte proceeding begun in the circuit court of Jackson county, Mo., Richard Hill, one of the defendants, was appointed trustee to hold the property and execute such trusts as may have been reposed in Granville Hedrick. It was next averred, in substance, that the Church of Jesus Christ of Latter-Day Saints was first organized in the state of New York in the year 1830; that it removed thence to Kirtland, Ohio, in 1831; that a branch of said church was established at the town (now city) of Independence, Mo., in 1832, and another branch thereof at Nauvoo, Ill., some years later; and that it was while a branch of said church was thus established at Independence, Mo., that the premises now in controversy were acquired by Edward Partridge for the use of said church as heretofore stated. It was further averred that said church, while established at Nauvoo, Ill., about the year 1846, was broken up and became divided into factions, part of the members going to Salt Lake, Utah, under the leadership of Brigham Young, and the residue of the members locating at different points in the states of Illinois, Wisconsin, and Michigan under the leadership of various persons; that eventually those members of the church who adhered to the true faith as taught in 1832 and to subsequent authentic revelations, and who did not follow Brigham Young to Utah, became consolidated into the complainant corporation, under the name of the Reorganized Church of Jesus Christ of Latter-Day Saints; and that, by virtue of continuing to hold the true faith, the complainant church was the owner of all the property in controversy. The bill further averred that the defendant church, to wit, the Church of Christ at Independence, Mo., which had obtained possession of the property in controversy and was using it as a place of worship, consisted of less than 20 members; that it had no organization elsewhere than at the city of Independence, Mo.; and that it had departed from the true faith of the Church of Jesus Christ of Latter-Day Saints, originally organized in New York, in that said defendant church and its members denied all the articles of faith adopted by the mother church after the year 1835, and insisted that after the year 1834 Joseph Smith, the original founder of the church, was a fallen prophet, and that his teachings subsequent to that date were false and heretical. The bill prayed for a decree, declaring, among other things, that the real estate in controversy, and the whole thereof, belonged to and was the property of the Reorganized Church of Jesus Christ of Latter-Day Saints, free and clear of all rights, claims, and interests of the defendants or any of them therein.

The answer to the bill of complaint denied many of the allegations therein contained. Among other things, the defendants denied that the complainant church was the owner of any of the lots of land described in the bill of complaint to which it laid claim. They denied that Edward Partridge acquired the title to said lands in trust for the Church of Jesus Christ of Latter-Day Saints, or that he ever conveyed the same to the three minor children of Oliver Cowdery in trust for the purposes stated in the bill of complaint, or for any other purpose. Besides denying some other material allegations of the bill, the defendants pleaded substantially the following facts: That James Pool purchased the property in controversy from Lydia Partridge, the widow of Edward Partridge, and from Eliza M. Partridge, Emily D. Partridge, and Caroline E. Partridge, the children of Edward Partridge, in the year 1848, paying therefor the sum of $300; that, at the time of making said purchase, said Pool had no notice whatever that any other person or persons claimed to have any interest in the property, and that the deed conveying the same to said James Pool was duly recorded in the proper registry office of Jackson county, Mo., on June 16, 1848; that James Pool shortly afterwards sold and conveyed said property to John Maxwell, who was also an innocent purchaser of the same for value; and that by virtue of numerous other conveyances thereafter made, which were specifically described in the defendants' answer, the title to lots 16, 20, and 21, originally acquired by James Pool from the heirs of Edward Partridge, became vested in John H. Hedrick prior to November 8, 1869; and that the title of said James Pool to lots 15, 17, 18, 19, and 22 became vested in one William Eaton prior to November 5, 1877. The answer further averred that on November 8, 1869, and on November 5, 1877, John H. Hedrick and wife and William

Eaton and wife severally conveyed the lots by them respectively owned as aforesaid to Granville Hedrick, in trust for the defendant church,—that is to say, the Church of Christ at Independence, Mo.; and that said Granville Hedrick continued to hold the property so acquired upon such trust until his death in September, 1890, after which date the defendant Richard Hill was appointed trustee to hold the said property upon the same trust. The defendants further alleged in their answer, in substance, that the great body of the members of the original church, termed the Church of Jesus Christ of Latter-Day Saints, after the breaking up of that church at Nauvoo, Ill., followed Brigham Young to Utah territory; that a few separated from the main body, remained behind, and followed various factional leaders or spiritual advisers; that dissenters from these various factional organizations eventually organized the so-called Reorganized Church of Jesus Christ of Latter-Day Saints; and that said last-named church since its organization had propagated "a combination of tenets and doctrines peculiar to its organization by and through a system unknown to the adherents of the Church of Jesus Christ of Latter-Day Saints from which it claims to have descended." The answer also alleged that the complainant church had never exercised any authority or control over the several lots in controversy, but that, in point of fact, the defendant church,—that is to say, the Church of Christ at Independence, Mo.,—by its members and its trustee, had for more than 20 years held possession thereof, openly and notoriously, and had paid all the taxes on said property.

In the circuit court there was a decree in favor of the complainant. 60 Fed. 937. By the terms of the decree, it was adjudged, among other things: "That the Reorganized Church of Jesus Christ of Latter-Day Saints * * * is a corporation duly and regularly organized under the laws of the state of Iowa, and as such includes in its corporate capacity the whole of the membership thereof, wherever found; and that the complainant has the right to maintain this action in its corporate capacity. That the property in controversy, to wit, lots 15 to 22, inclusive, in Woodson & Maxwell's addition to the city of Independence, in the county of Jackson, state of Missouri, is and stands charged with a trust in favor of complainant, and that complainant is the owner of the equitable title in and to said land, the possession of which is now held by the respondents. * * * That the purported deed from three of the five heirs of Edward Partridge to James Pool was not acknowledged according to law, and the record thereof imparted no notice; and that neither said respondents nor any person through whom they claim title ever had actual or constructive possession of said property until about the month of September, 1882, and within ten years of the bringing of this suit. * * * That the said complainant is the owner of the property in controversy; and that said respondents nor either of them have any legal or equitable interest therein, and are not entitled to the possession thereof; and that complainant, as such owner, is entitled to the immediate possession thereof. * * * That the absolute title to said property be and is vested in complainant; and that it is entitled to the immediate possession thereof, free and clear of all rights, claims, or interests of the respondents, or any of them. * * * That if, upon demand by complainant upon respondents, and a refusal to obey the decree or order of this court, complainant shall be entitled to a writ of assistance from the clerk of this court, upon proof made by affidavit of such demand and refusal to obey, which writ shall command the marshal of this court to eject the defendants, and each and all of them, from said land, to wit, lots 15, 16, 17, 18, 19, 20, 21, and 22 in Woodson & Maxwell's addition to the city of Independence, Jackson county, Missouri, and put complainant in possession thereof." From the foregoing decree the defendants have prosecuted an appeal to this court.

C. O. Tichenor and John N. Southern, for appellants.

Frank Hagerman and E. L. Kelley (P. P. Kelley, L. Traber, and George Edmunds, on the briefs), for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The first question that deserves consideration is whether, by the allegations of its bill and the evidence offered to support it, the plaintiff corporation (hereafter termed the "Reorganized Church") succeeded in showing that it was vested with such a title to the premises in controversy as was adequate to maintain the action and to recover the possession of the property from those who were then holding and occupying it.    The plaintiff corporation was organized on June 6, 1891, at Lamoni, Decatur county, Iowa, under the general laws of that state relating to "corporations other than those for pecuniary profit."    McClain's Ann. Code Iowa 1888, pp. 413, 414, tit. 9, c. 2. At the date of its organization as a corporation (according to the allegations of the bill), the legal title to the premises in controversy was vested either in the heirs of George A. Blakeslee, a former bishop of the Reorganized Church, or in E. L. Kelley, his successor in office.    It was so vested by virtue of the deed said to have been executed by Marie Louise Johnson and her husband on June 9, 1887, whereby they undertook to convey the premises in dispute to said George A. Blakeslee, bishop, and to his successor in office, as trustee, in trust for the use and benefit of the Reorganized Church, according to the laws and usages of the same.    The bill of complaint was obviously framed on the theory that this latter deed vested in George A. Blakeslee, as bishop of the Reorganized Church, upon the trust aforesaid, the title originally conveyed by Edward Partridge to the three minor children of Oliver Cowdery by his deed of March 28, 1839, because said Marie Louise Johnson was the only surviving heir of said children in whom the title in trust had become vested by descent. The plaintiff church, so far as the proof shows, took no steps before the institution of this suit to acquire the legal title thus vested in the heirs of George A. Blakeslee, or in the present bishop of the Reorganized Church, by the deed of Marie Louise Johnson and her husband. It is contended, however, that such action was unnecessary, for the reason that the articles of association adopted by the members of the Reorganized Church on April 6, 1891, operated to vest the plaintiff corporation with an equitable title to the premises in dispute, on the strength of which title it could oust adverse occupants of the land and recover the possession thereof by a suit in equity.

We think that this position is untenable.    A complainant who has only an equitable title to land cannot maintain a suit in chancery to recover the possession of the land from an adverse occupant, unless such occupant holds the legal title, and the complainant seeks to obtain it, or unless the adverse occupant acquired possession of the land under the alleged equitable title, or is so connected therewith that it may be asserted against him.    Fussell v. Gregg, 113 U. S. 550, 554, 5 Sup. Ct. 631, and cases there cited.    None of these latter conditions appear to exist in the present case.    According to the averments of the bill, the person in whom the legal title is now vested in trust for the members of the Reorganized Church is not before the court.    The bill does not concede that the defendants who are in possession, and who are holding the premises in dispute under a conveyance by the

heirs of Edward Partridge to James Pool of date May 5, 1848, have any title to the premises, either legal or equitable. On the contrary, it was expressly averred in the bill that, at the time of the conveyance to James Pool, "the widow and children of said Partridge had no ownership in said land, nor any interest in trust." Besides, it was alleged by the plaintiff corporation, and the circuit court so found, that James Pool was not an innocent purchaser from the Partridge heirs, and that all subsequent purchasers of the Pool title bought with notice of that fact. This placed the defendants in the attitude of mere trespassers upon the premises in controversy; and, according to the rule last stated, they could not be ousted of possession by a proceeding in equity at the instance of a suitor who at most only claimed an equitable interest in the property which was acquired by the incorporation of the Reorganized Church in a foreign state. Whether such act of incorporation had the effect of transferring to the plaintiff corporation an equitable interest in the premises in controversy, the same being land situated in a foreign state, we need not stop to inquire; for, in our opinion, the equitable interest so acquired, whatever may have been its nature, was not sufficient to support an action for the recovery of the possession from an adverse occupant who claimed under an independent title, to wit, under the conveyance to James Pool made by the heirs of Edward Partridge on May 5, 1848, and who denied the existence of the trust said to have been declared or created by the deed of Edward Partridge to the Cowdery children of date March 28, 1839. Under the pleadings and the evidence, the situation is briefly as follows: The plaintiff corporation alleges, in effect, that the legal title to the premises is now vested in the heirs of George A. Blakeslee or in E. L. Kelley, the present bishop of the Reorganized Church, in trust for the use and benefit of the members of the latter church, and that said Reorganized Church is the legitimate successor of the Church of Jesus Christ of Latter-Day Saints, in whose favor a trust in the premises was originally created, because the members of said Reorganized Church hold the same faith and practice the same rites. On the other hand, the defendants aver that they purchased the property from persons who owned the Pool title, and that the legal title to the premises is now well vested in Richard Hill, in trust for the use and benefit of the defendant church, to wit, the Church of Christ at Independence, Mo. The defendants also deny the authenticity of the deed said to have been executed by Edward Partridge on March 28, 1839, in favor of the Cowdery children. They also deny the existence of the trust thereby declared or created.

The case, therefore, is not one where the title to church property is undisputed, and the trust upon which it was originally conveyed is admitted, and a controversy has arisen between rival church factions as to which is the proper beneficiary of the trust,—a controversy growing out of the fact that one or the other faction has abandoned the original faith, or has altered the form of church government. In such cases, no doubt, a court of equity has jurisdiction to inquire into matters of faith and discipline, and to determine, in view of such inquiry, who is the proper beneficiary, and, as such, entitled to the

use, custody, and control of the church property. But in the suit at bar the respective parties assert different legal titles held by different persons upon different trusts, or for the use of different religious sects or congregations. The most important question presented by the record would seem to be whether the legal title now said to be held by the heirs of George A. Blakeslee or by E. L. Kelley, his successor in office, for the use and benefit of the Reorganized Church, is superior to the legal title said to be held by Richard Hill in trust for the Church of Christ at Independence, Mo.; and that is a question which should be determined by a court of law. Moreover, it would seem that the settlement of that question will, at the same time, determine upon what trust, if any, the property in controversy is now held.

There is another reason, we think, why a court of equity ought not to lend its aid at this late day to enforce the trusts declared by the alleged deed of Edward Partridge to the children of Oliver Cowdery, deceased. That deed, although it purports to have been executed and acknowledged by Partridge in the month of March, 1839, was not recorded until February 7, 1870, prior to which latter date no one seems to have been aware of its existence. The original deed, which is quoted in full in the margin,[1] was not produced at the trial of the case; and the evidence failed to show who had possession of the same, or whether it was still in existence. The land embraced by the description in that conveyance is a tract containing about 63 acres, which is now situated in the heart of the city of Independence, Mo. The 8 lots in controversy in this suit, which contain altogether

---

[1] Edward Partridge to Jane Cowdery et al. Know all men that whereas, there was money put in my hands, to wit, in the hands of Edward Partridge, by Oliver Cowdery, an elder in the church of Latter-Day Saints formerly of Kirtland, state of Ohio, for the purpose of entering lands in the state of Missouri in the name of and for the benefit of said church; and whereas, I, Edward Partridge, was bishop of and in said church, he took said money and funds thus put in his hands, and entered the land in his own name, in the county of Jackson, state of Missouri, in the name of Edward Partridge, the signer of this deed: Now, know ye that for the furthering the ends of justice, and as I have to leave the state of Missouri, by order of Governor Boggs, and with me also our church, I do for the sum of one thousand dollars, to me in hand paid by said Oliver Cowdery, do give, grant, bargain, and sell to John Cowdery, son of Oliver Cowdery now seven years old, and Jane Cowdery, three years, and Joseph Smith Cowdery, one year old, all the lands entered in my name in the county of Jackson, in the district of Lexington, in the state of Missouri. Said Edward Partridge, the first party and signer of this deed, does also sell, alien, and confirm to the aforesaid John Cowdery all real estate and lands he has both entered as aforesaid and all he owns in his own name by private purchase and holds by deed of gift, being intended for the use of the Church of Latter-Day Saints or otherwise. This sale is to embrace all lots, of all sizes, situated in Independence, and to embrace the lot known as the "Temple Lot," and all other lands, of whatever description, said Partridge the first party is entitled to in said Jackson county, in the state of Missouri. Said Partridge also agrees to amend this deed to said Oliver Cowdery at any time for the purposes aforesaid.

Given under my hand and seal, on the date above written.

                                      Edward Partridge. [Seal.]

E. G. Gates, Witness.

about 2½ acres, are a part of the 63-acre tract, and are referred to in the deed as the "Temple Lot." The deed for the same property that was executed by the widow and children of Edward Partridge on May 5, 1848, was filed for record and was recorded in Jackson county, Mo., on June 16, 1848. It purported to convey to James Pool, for an expressed consideration of $300, a tract of land described by metes and bounds, containing 63.43 acres. This tract was subsequently subdivided into five additions to the city of Independence, Mo., by persons who claimed title to the same under the conveyance to James Pool of date May 5, 1848. The first of these additions, which embraces the lots in controversy, was made by Woodson & Maxwell, by a plat duly filed and recorded as early as March 31, 1851. Two other additions were carved out of the tract, and plats thereof were filed in the years 1866 and 1868. The residue of the tract became additions to the city by plats which were approved by the city authorities and filed during the years 1886 and 1887, respectively. Since the tract was thus subdivided into additions, and attached to the city of Independence, hundreds of persons have bought lots therein in reliance on the Pool title. Streets and alleys have been opened through the tract, and many buildings and other improvements have been erected, at great expense to the numerous occupants of the property. These improvements began, as it seems, long prior to the year 1870, and have continued without interruption to the present date. The record further shows that the lots in controversy became the subject-matter of a suit in partition between the heirs of John Maxwell, deceased, and Samuel H. Woodson, in the year 1859; and that, by virtue of the decree in that suit, said lots were subsequently exposed for sale, and some of them were actually sold and conveyed to the respective purchasers. It should be stated in this connection that John Maxwell purchased the Pool title to the 63-acre tract originally owned by Edward Partridge as early as August 3, 1848. He entered into a contract with Samuel H. Woodson in February, 1851, by virtue of which the latter acquired an interest in the property; and, after the death of Maxwell and after the laying out of Woodson & Maxwell's addition, Woodson brought the aforesaid suit in partition against the heirs of Maxwell, which resulted in the decree of partition last mentioned and in a judicial sale of the premises in controversy.

The evidence shows that the title asserted by the defendants to the lots in controversy was acquired by Granville Hedrick, as trustee of the Church of Christ, from John H. Hedrick and wife, and from William Eaton and wife, on November 8, 1869, and on November 5, 1877, substantially as alleged by the defendants in their answer. John H. Hedrick and William Eaton appear to have acquired their respective titles to the lots in controversy through persons who purchased the lots at the partition sale aforesaid under the decree in the case of Samuel H. Woodson v. The Heirs of John Maxwell, deceased. The title thus asserted by the defendants under the Pool deed of May 5, 1848, is the same paper title, so far as the record discloses, under which every lot of land lying within the 63-acre tract originally owned by Edward Partridge is now held by the

numerous persons who, during the last 30 years, have settled on the tract and have erected improvements thereon. Moreover, it is the only record title that was generally recognized as conferring any interest in said tract of land for more than 40 years before the present suit was instituted. The claim, therefore, which is now preferred by the plaintiff church under the deed of March 28, 1839, to the minor children of Oliver Cowdery, operates as a cloud upon the title to the entire tract. It is, doubtless, true that many of the occupants of the property in question, whose titles are clouded by the present litigation, could, if put to the test, show a good title to the respective lots of land by them occupied by adverse possession for more than 10 years; but, as is well known, the improvement of property is frequently delayed or prevented, and the market value thereof is often seriously impaired, especially if, as in this instance, it is city property, by a cloud cast upon the record title, which can only be removed by proof of adverse occupancy for the period necessary to confer a title by the statute of limitations. It is also a significant fact that from the year 1867 to the present time the two trustees of the defendant church, to wit, Granville Hedrick and Richard Hill, and the persons under whom they claim title, have paid all the taxes that have been assessed against the several lots now in controversy. The taxes so paid amount to a considerable sum. In the meantime no one seems to have questioned the title under which the trustees claimed to hold said property, or their right of occupancy, until June 11, 1887. At the latter date a notice was served on the defendant Richard Hill by George A. Blakeslee, acting as bishop and trustee of the Reorganized Church, requiring him to cease making further improvements on the property in controversy, and to surrender the possession thereof to the Reorganized Church. The suit at bar to enforce this demand was not commenced, however, until five years thereafter, to wit, on August 6, 1891. It is also a noticeable circumstance that, some years before the commencement of the present suit (but how long before the evidence does not definitely disclose), a congregation of the Reorganized Church erected a house of worship at Independence, which is situated across the street from the lots in controversy, and entirely outside of the 63-acre tract originally owned by Edward Partridge, which is now claimed to be held in trust for the use and benefit of the Reorganized Church.

In view of the foregoing facts, we think that the plaintiff church and those whom it claims to represent have been guilty of such laches as should bar them from all relief in the forum of equity, even though it appeared that the premises in controversy were originally held in trust by Edward Partridge for the Church of Jesus Christ of Latter-Day Saints, and even though it appeared that Reorganized Church is at this day the legitimate successor of the original beneficiary. It behooves all persons who claim an interest in real property which is situated within the limits of a large town or city, and is rapidly coming into demand and appreciating in value, to be active and vigilant in the assertion of their rights thereto. A person claiming an interest in such property cannot remain silent and inactive for a long period while third parties are buying, selling, improving, and

otherwise dealing with the property as their own, in reliance on a record title that is perhaps defective, and then be permitted to assert his own claim thereto in a court of equity. Courts of equity will not take such action as will discredit a title that has been dealt in for years and recognized as valid, and on the validity of which the fortunes of many persons may depend, unless their aid is invoked by a suitor who shows a clear equitable right, nor unless he has been diligent in making his rights known and prompt in seeking relief when they were invaded. It is hardly necessary to observe that this is a familiar equitable rule, founded upon sound considerations of public policy, which has been frequently stated and applied, especially by the federal courts. Badger v. Badger, 2 Wall. 87, 95; Godden v. Kimmell, 99 U. S. 201; Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873; Felix v. Patrick, 145 U. S. 317, 12 Sup. Ct. 862; Naddo v. Bardon, 4 U. S. App. 642, 2 C. C. A. 335, and 51 Fed. 493; Lemoine v. Dunklin Co., 10 U. S. App. 227, 2 C. C. A. 343, and 51 Fed. 487; Railroad Co. v. Sage, 4 U. S. App. 160, 1 C. C. A. 256, and 49 Fed. 315; Wetzel v. Transfer Co., 12 C. C. A. 490, 65 Fed. 23.

It is urged, however, that the plaintiff church and those persons in whose behalf it sues are not guilty of laches for three reasons: First, because the founder of the trust and his adherents, commonly called "Mormons," were driven out of the state of Missouri in the years 1838 and 1839 by military force, and found it dangerous to return; second, because the defendants and those through whom they claim have not occupied the lots in controversy continuously for a period of 10 years since their title thereto had its inception; and, third, because the suit is one to enforce the provisions of an express trust. We think that none of the reasons so assigned can be deemed a sufficient excuse for the failure to institute this proceeding at an earlier day. More than 20 years elapsed after the deed of Edward Partridge to the Cowdery children was filed for record in Jackson county before the bill of complaint in the present suit was filed, and during that period no obstacles seem to have stood in the way of a speedy assertion of the same title and claim to the property in controversy that is now asserted. It admits of no doubt, we think, that it was as well known in 1870 as it is now that the entire tract of land originally owned by Edward Partridge, embracing the lots in controversy, was then held by numerous persons who claimed to be the absolute owners of the property under the conveyance executed by the heirs of Edward Partridge to James Pool on May 5, 1848. The larger part of the tract had already been platted as additions to the city of Independence, Mo.; a portion thereof, including the lots in controversy, had been partitioned and sold in the suit between Samuel H. Woodson and the heirs of John Maxwell, deceased; and buildings and other improvements had then been erected, or were shortly thereafter erected, on all parts of the tract. While there may have been flaws in the record title of those who thus claimed to own the lots in controversy and other portions of the tract, yet the acts aforesaid amounted to a denial of the alleged trust, and they were of such character that they should have inspired prompt and decisive action on the part of those who claimed

to be beneficiaries of the trust as soon as they discovered authentic evidence of their alleged rights. We conclude, therefore, that, in view of the open denial of the trust for more than 20 years, the members of the Reorganized Church have acquiesced too long in the assertion of adverse rights to the property in controversy to be now heard to complain, even if we should concede that they were not guilty of laches before the deed to the Cowdery children was discovered and placed of record, and before the alleged trust affecting the property became generally known.

With reference to the contention that laches is not available as a defense to this action because the defendants have not occupied the premises in controversy continuously for a period of 10 years since the inception of their title, it seems sufficient to say that the plea of laches is frequently available in equity even when the defendant has not been in possession of the property sued for, for a sufficient period to confer a title by the statute of limitations. Under a variety of circumstances, especially where property has rapidly appreciated in value, or it has been improved by those in possession, or where the rights of third persons will be seriously affected by a decree, courts of equity will refuse to interfere even when the facts are such that the plea of the statute of limitations could not be maintained at law. Wetzel v. Transfer Co., 12 C. C. A. 490, 65 Fed. 23; Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, and cases there cited. This principle applies in suits to enforce an express trust, where the trust has been openly denied, as well as in suits to enforce a constructive trust. In the case at bar it is conceded that, besides paying the taxes on the property, the defendants built a church on the lots in suit in the year 1882, and that they have occupied it continuously since that date as a house of worship. No notice of an existing adverse claim to the property was given to the defendants while the structure in question was being erected, nor for more than five years thereafter, although, as it seems, a congregation of the Reorganized Church occupied another church edifice in close proximity to the premises, and were doubtless well aware of the improvements that were being made on the property in controversy. Besides, the title by which the defendants claim to hold the lots in suit is the same title by which a much larger tract of land within the city of Independence has apparently been held for more than 40 years, and the relief prayed for as against the defendants cannot be granted without impairing the value and clouding the record title to much other valuable property situated within the city. Under these circumstances, we think that laches is a good and sufficient defense to the action, even though the defendants did not actually occupy the lots in controversy for the full term of 10 years before this suit was commenced.

In accordance with the views herein expressed, the decree of the circuit court will be reversed, and the cause will be remanded, with directions to dismiss the bill of complaint.